UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SABELITA HAWKINS, | CASE NO. C16-0498JLR |
| Plaintiff, | ORDER |
| v. | |
| UNITED STATES OF AMERICA, et al., | |
| Defendants. | |

## I.   INTRODUCTION

Plaintiff Sabelita Hawkins initiated the instant action against Defendant the United States of America (the "Government") under the Federal Tort Claims Act in connection with treatment she received from physicians at the Seattle Veterans Medical Center in October and November 2011.  (*See* Compl. (Dkt. # 1) ¶¶ 5.1-5.7.)[1]  This matter came for

---

[1] Ms. Hawkins's remaining claims were dismissed on summary judgment.  (*See* 12/19/24 Order (Dkt. # 101).)

ORDER - 1

trial on June 9-11, 2025, before the court sitting without a jury, and the parties subsequently submitted proposed findings of fact and conclusions of law.  (*See* 6/9/25 Min. Entry (Dkt. # 138); 6/10/25 Min. Entry (Dkt. # 139); 6/11/25 Min. Entry (Dkt. # 141); Hawkins FOFCOL (Dkt. # 157); Government FOFCOL (Dkt. # 156).)  The court heard closing arguments from counsel on July 28, 2025.  (*See* 7/28/25 Min. Entry.)  The court has considered and weighed the evidence admitted at trial using the required "preponderance of the evidence" standard.  Being fully advised, the court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).[2]

## II.   FINDINGS OF FACT

**A.   The Parties and Relevant Background**

1.      In 2011, Ms. Hawkins was 43 years old and a resident of Washington.  (*See* Def. Trial Ex. A-7 at 53; Compl. ¶ 3.1.)

2.      Ms. Hawkins is a veteran who served in the United States Navy.  (6/9/25 Tr. (Dkt. # 153) at 15:20-24, 16:8-11.)  Accordingly, she received medical treatment at the Seattle Veterans Medical Center (the "VA Medical Center"), which is part of the VA Puget Sound Healthcare System.  The VA Medical Center is a division or agency of the Department of Veteran's Affairs.  The Government owns and operates the VA Medical

---

[2] To the extent any of the court's findings of fact may be deemed conclusions of law, they shall also be considered conclusions of law.  Similarly, to the extent any of the court's conclusions of law may be deemed findings of fact, they shall also be considered findings of fact. *See In re Bubble Up Del., Inc.*, 684 F.2d 1259, 1262 (9th Cir. 1982).

ORDER - 2

Center.

3.     On October 22, 2011, Ms. Hawkins experienced a psychotic episode and was taken to the emergency department ("ER") at the VA Medical Center. (Def. Trial Ex. A-7 at 47-50.) She received follow-up treatment in connection with the October 22 episode at the VA Medical Center between October 26, 2011 and November 30, 2011. (*Id.* at 34-50.) On December 15, 2011, Ms. Hawkins had a second psychotic episode.

4.     Dr. Daniel B. Doan was a licensed internal medicine resident at the VA Medical Center at all times relevant to this lawsuit. He treated Ms. Hawkins on October 26, 2011, and November 16, 2011. (Admitted Facts (Dkt. # 126) ¶¶ 20, 30.) Although Ms. Hawkins alleged that Dr. Doan committed medical malpractice (*see* Compl. ¶¶ 4.21-4.22), the court dismissed Ms. Hawkins's claim against Dr. Doan during trial. (6/9/25 Tr. at 160:21-161:19.)

5.     Dr. Carl F. Jensen was a licensed psychiatrist at the VA Medical Center at all times relevant to this lawsuit. (Admitted Facts ¶ 34.) He treated Ms. Hawkins on November 30, 2011. (*Id.*) Ms. Hawkins alleges that Dr. Jensen committed medical malpractice. Dr. Jensen's conduct is attributed to the Government for purposes of this lawsuit.

**B.     Credibility Determinations**

The court makes the following findings regarding the credibility of the parties' witnesses and the weight it gives to the testimony of certain witnesses:

6.     Ms. Hawkins is the plaintiff in this matter and is therefore an interested party. The court finds that some portions of her testimony are credible, but other portions

ORDER - 3

are not.  Specifically, the court finds that Ms. Hawkins's testimony regarding the symptoms she experienced in the time period preceding her October 22 and December 15 psychotic episodes is credible.  The court also finds, however, that Ms. Hawkins's testimony regarding what she *reported* to Dr. Doan and Dr. Jensen about her medical history and symptoms is not entirely consistent with the medical record evidence.

   a.   For example, Ms. Hawkins testified that she experienced "extreme" insomnia and was sleeping only three to four hours per night in the days preceding her October 22 psychotic episode (*see* 6/9/25 Tr. at 132:12-133:4), but her medical records show that she reported sleeping six to eight hours per night during that timeframe (Def. Trial Ex. A-7 at 50).

   b.   Ms. Hawkins further testified that she "rare[ly]" drank alcohol prior to October 22, 2011.  (6/9/25 Tr. at 131:10-15.)  Dr. Doan noted, however, that Ms. Hawkins reported during her October 26, 2011 appointment that she had "become habituated to taking a pain pill or drinking" during periods of high stress. (Def. Trial Ex. A-7 at 41.)

   c.   Due to these inconsistencies, the court scrutinizes Ms. Hawkins's testimony regarding what she reported about her medical history and symptoms between her October 22 and December 15 episodes.

7.   Dr. Jensen treated Ms. Hawkins at the VA Medical Center following her October 22 psychotic episode, and his conduct is attributed to the Government.  He is therefore an interested party.  This creates the potential for bias in favor of the Government.

ORDER - 4

8.      The court finds no meaningful distinctions in the potential biases of the expert witnesses called by Ms. Hawkins and the Government.  The court does make findings, however, regarding these experts' credibility.

9.      Dr. David Dunner, a licensed psychiatrist, was retained as a litigation expert by Ms. Hawkins, which creates a potential for bias in her favor.  The court finds that Dr. Dunner's opinions have minimal persuasive value for the following reasons:

a.      Dr. Dunner stated that he did not have a complete set of Ms. Hawkins's medical records when he prepared his expert report.  Specifically, Dr. Dunner said that he had "some records" from the VA Medical Center and a copy of an evaluation report from Dr. Robert Olsen, another psychiatrist who examined Ms. Hawkins.  (*See* Pl. Trial Ex. 2 ("Dunner Report") at 6[3]; 6/10/25 Tr. (Dkt. # 154) at 199:7-13; *see id.* at 243:21-2:44:16.)  He acknowledged that his opinions may not be fully accurate if they are based on incomplete records.  (*Id.* at 246:2-16.)

b.      Moreover, Dr. Dunner's understanding of Ms. Hawkins's psychiatric history predating the October 22 episode derives from Ms. Hawkins's own account of that history.  Specifically, Dr. Dunner stated that he did not have records of Ms. Hawkins's prior hospitalizations and therefore could not "confirm whether she indeed had manic psychotic symptoms."  (Dunner Report at 6; *see id.* at 1; 6/10/25 Tr. at 243:21-244:9.)  Dr. Dunner's opinions regarding Dr. Jensen's adherence to the standard of care of a psychiatrist are based in part on Dr. Jensen's

---

[3] When citing Dr. Dunner's expert report, the court refers to the page number "__ of 11" in the top right corner of the page.

alleged failure to take a complete history of Ms. Hawkins's psychotic episodes predating October 2011. (*See* Dunner Report at 2; 6/10/25 Tr. at 218:8-16.) But Dr. Dunner *himself* did review Ms. Hawkins's psychiatric records predating October 2011. (6/10/25 Tr. at 199:13; Dunner Report at 1.) In closing argument, Ms. Hawkins's counsel conceded that Ms. Hawkins's alleged prior psychotic episodes predating October 2011 were not documented in medical records available to Dr. Jensen and were not formally diagnosed as psychotic episodes. The court therefore finds Dr. Dunner's opinions regarding Ms. Hawkins's past psychiatric history to be speculative and unreliable.

c.      Dr. Dunner testified that he spent six hours preparing his expert opinion, which included reviewing Ms. Hawkins's records, interviewing Ms. Hawkins, and dictating and reviewing his report. (6/10/25 Tr. at 213:16-22.) Only one and a half of those hours were spent interviewing and assessing Ms. Hawkins. (*Id.* at 245:20-25.) Dr. Dunner's expert report included inaccurate facts reflecting a lack of attention to detail. For example, Dr. Dunner's report notes that Ms. Hawkins was "discharged on an antipsychotic and lorazepam" following her October 2011 hospitalization. (Dunner Report at 2.) But according to her medical records, Ms. Hawkins was not, in fact, discharged with any medications. (*See* Def. Trial Ex. A-7 at 45.) Dr. Dunner also incorrectly understood Dr. Doan to be a psychiatrist, rather than an internal medicine resident. (*See* Dunner Report at 6, 7.) After learning at deposition that Dr. Doan was an internal medicine resident, Dr. Dunner stated that his opinions regarding Dr. Doan's adherence to the standard of care

ORDER - 6

would change.  (*See* Morris Decl. (Dkt. # 118) ¶ 2, Ex. 1.)[4]

d.      These issues regarding the credibility of Dr. Dunner's opinions are only a few of the examples presented during trial and in Dr. Dunner's expert report.  Due to these inconsistencies, the court assigns less weight to Dr. Dunner's opinions.

10.      Dr. Russell Vandenbelt, a retired licensed psychiatrist, was retained as a litigation expert by the Government, which creates a potential for bias in the Government's favor.  The court otherwise finds his testimony to be credible and consistent with the record evidence.

11.      Dr. Michael Kovar, a licensed internal medicine physician, was retained as a litigation expert by the Government, which creates a potential for bias in the Government's favor.  Although Dr. Kovar is not a psychiatrist, Dr. Kovar testified that part of his job as an internal medicine physician is to address mental and behavioral health issues.  (6/11/25 Tr. at 403:20-404:2.)  He also works closely with psychiatrists in his current clinical practice.  (*Id*. at 404:3-25.)  The court finds his testimony to be credible and consistent with the record evidence.

12.      The court finds no meaningful distinction in the potential biases of the fact witnesses called in this matter:

a.      Dr. Doan treated Ms. Hawkins at the VA Medical Center Women's Clinic ("VA Women's Clinic") following her October 22 psychotic episode.  Although Dr. Doan was dismissed as a defendant in this action, he previously had an interest

---

[4] Dr. Dunner did not prepare an updated expert report after learning that Dr. Doan was not a psychiatrist.  (*See* 6/10/25 Tr. at 224:12-15.)

ORDER - 7

in this matter. The court finds this creates the potential for bias in favor of the Government.

b.    Ms. Hawkins called Dr. Traci Takahashi, a licensed internal medicine attending physician, as a fact witness. Dr. Takahashi supervised Dr. Doan's treatment of Ms. Hawkins following her October 22 psychotic episode. (6/11/25 Tr. (Dkt. # 155) at 374:22-24.) This creates the potential for bias in favor of the Government.

**C.    Ms. Hawkins's Employment with the VA Medical Center**

13.    In 2007, Ms. Hawkins applied for a nursing license in Washington. (6/9/25 Tr. (Dkt. # 153) at 19:25-20:18.)

14.    In 2008, Ms. Hawkins was issued a credential to practice as a registered nurse in Washington. (*Id.* at 20:16-22.) That year, she was appointed as a nurse at the VA Medical Center. (*Id.*)

**D.    Ms. Hawkins's Medical History**

15.    Ms. Hawkins had a history of psychiatric symptoms or episodes—which Dr. Dunner described as "psychiatric encounters"—in 1986, 1994, 1998, 2001, 2005, and 2009. (Dunner Report at 2.) As Ms. Hawkins's counsel confirmed in closing arguments, these prior psychotic episodes were not formally diagnosed and are not documented in any available medical records that were available to Dr. Jensen.

16.    Beginning in 2009, Ms. Hawkins received intermittent counseling from Heidi R. Swailes, LMHC. (Admitted Facts ¶ 13.) Ms. Swailes was not affiliated with the

ORDER - 8

VA Medical Center.  (*Id.*)

**E.      Ms. Hawkins's October 22, 2011 Psychotic Episode and Preceding Events**

17.      Ms. Hawkins alleges that she experienced workplace harassment by her supervisor sometime prior to October 22, 2011.  (Def. Trial Ex. A-7 at 35, 41, 50; *see* 6/9/25 Tr. at 29:19-30:2.)

18.      Between October 3, 2011 and October 12, 2011, Ms. Hawkins attended two appointments and three phone consultations with the VA Women's Clinic in connection with esophageal reflux, stomach pain, and diarrhea.  (Def. Trial Ex. A-7 at 68-78.)  She did not raise any mental health concerns during those appointments or consultations. (*See id.*)

19.      On October 12, 2011, Ms. Hawkins tested positive for Helicobacter Pylori ("H. Pylori"), a bacterial infection in the stomach that can cause ulcers and inflammation. (Def. Trial Ex. A-7 at 67.)  Dr. Stacy Westerman prescribed Ms. Hawkins a "triple therapy" prescription medication of two antibiotics (clarithromycin and amoxicillin) and a proton pump inhibitor (pantoprazole) to treat her H. Pylori infection.  (*Id.*)

20.      On October 22, 2011, Ms. Hawkins experienced her first documented psychotic episode.  (Def. Trial Ex. A-7 at 47-54; *see* Hawkins FOFCOL ¶ 5.)  During this episode, she locked a staff member in a supply closet, threw a stapler, attempted to bite staff, and kicked a VA Medical Center police officer.  (Def. Trial Ex. A-7 at 49, 62-63; *see* 6/9/25 Tr. at 33:17-35:23.)  A "code green" was called and VA Medical Center police responded to the incident.  (Def. Trial Ex. A-7 at 49.)  Ms. Hawkins was arrested and taken to the VA Medical Center ER.  (*See id.*)

21.     In the VA Medical Center ER, Ms. Hawkins "shout[ed] loudly and incoherently," "vocaliz[ed] colors she was seeing," and was agitated and combative with hospital staff.  (*Id*.)  She was physically restrained and given two milligrams of lorazepam,[5] to which she was not responsive, and was subsequently given two milligrams of haloperidol,[6] to which she responded "very well" and after which she became "calm and cooperative."  (*Id*. at 49, 53.)  Her chief complaint in the ER was described as "increased agitation with acute psychosis."  (*Id.* at 49.)

22.     Later on October 22, 2011, after Ms. Hawkins calmed and became cooperative, she was assessed by a VA Medical Center psychiatry resident, Dr. Janet M. Soeprono.  (*Id.* at 49-54.)  During the psychiatry assessment, Ms. Hawkins reported that she took Vicodin[7] and drank alcohol at a party the night before, and recalled coming into work that morning feeling angry, but she did not remember her psychotic episode.  (*Id.* at 49.)  Ms. Hawkins's urine toxicology results were positive for oxycodone.  (*Id.* at 49, 52.)  Ms. Hawkins also reported that she was sleeping six to eight hours per night, but felt anxious and stressed due to a union action she initiated against her supervisor for the alleged workplace harassment.  (*Id.* at 50.)

23.     Dr. Soeprono observed that Ms. Hawkins had a past history of major depressive disorder and anxiety.  (*Id.*)  She also noted that Ms. Hawkins was sexually

---

[5] Lorazepam is a benzodiazepine commonly known as Ativan.  *See* https://medlineplus.gov/druginfo/meds/a682053.html.

[6] Haloperidol is an antipsychotic commonly known as Haldol.  *See* https://medlineplus.gov/druginfo/meds/a682180.html.

[7] Ms. Hawkins reported taking Vicodin to one physician, and she reported taking Percocet to another physician.  (*See* Def. Trial Ex. A-7 at 41, 49.)

ORDER - 10

abused by her stepfather when she was in middle and high school beginning at age nine. (*Id.* at 51.)

24.     Dr. Soeprono assessed Ms. Hawkins's past mental health history. Specifically, she noted that Ms. Hawkins's records showed that she was taken to an unidentified hospital once for "odd behavior" and another time for taking off her clothes on the street. (*Id.* at 50.) Dr. Soeprono also stated that Ms. Hawkins received "mental health treatment from 1989-1998 in Chicago," and was admitted into psychiatric units at unidentified hospitals at age 18 when "things came to head with [her] stepfather" and at age 26 due to "road trip, hadn't slept for 4 days[.]" (*Id.*) Dr. Soeprono did not characterize these incidents as psychotic episodes.

25.     Dr. Soeprono noted that there could be "various possible etiologies" for Ms. Hawkins's condition, "ranging from [an] acute medical issue . . ., an underlying primary psychotic disorder, a mood disorder such as depression with psychosis or bipolar disorder, or a substance abuse disorder[.]" (*Id.* at 53.) Dr. Soeprono recommended that Ms. Hawkins be admitted for stabilization and monitoring. (*Id.*) She also noted, "consider risperidone[8]  . . patient has agreed[.]" (*Id.*)

26.     On October 22, 2011, Ms. Hawkins was voluntarily transferred[9] to Swedish Edmonds Hospital. (*Id.* at 53-54; Admitted Facts ¶¶ 16-17.) She was discharged on

---

[8] Risperidone is an antipsychotic medication. *See* https://medlineplus.gov/druginfo/meds/a694015.html.

[9] Ms. Hawkins was transferred because the staff at the VA Medical Center knew her professionally. (*See* Def. Trial Ex. A7 at 53.)

ORDER - 11

October 24, 2011 without any final diagnosis or medications and with instructions to follow up with her primary care and mental health providers.  (*See* Def. Trial Ex. A-7 at 45.)

27.     On October 26, 2011, Ms. Hawkins was placed on administrative leave and was not permitted to return to work.  (Admitted Facts ¶ 18; Pl. Trial Ex. 11.)

**F.      Ms. Hawkins's October 26, 2011 Appointment with Dr. Doan[10]**

28.     On October 26, 2011, Ms. Hawkins saw Dr. Doan at the VA Women's Clinic.  (Def. Trial Ex. A-7 at 40-41.)  Dr. Doan was supervised by Dr. Takahashi.  (*Id.* at 37, 40; 6/11/25 Tr. at 375:25-376:1.)

29.     Dr. Doan noted that Ms. Hawkins reported that the October 22 incident was "very far from her baseline" and that "nothing like th[at] ha[d] ever happened before." (Def. Trial Ex. A-7 at 41.)  Ms. Hawkins also reported feeling stressed and anxious due to the union action and caring for her 18-month old daughter (*id.* at 41; Admitted Facts ¶ 23).  Ms. Hawkins testified that she did not get "proper rest" for two to three weeks before October 22, 2011 because she was "up writing [her] statement . . . [to] present" in her union action.  (6/9/25 Tr. at 31:24-32:4.)

30.     Ms. Hawkins also said she took Percocet[11] at a party the night before October 22, and noted that she felt "altered" the next day.  (Def. Trial Ex. A-7 at 41.)  Dr.

---

[10] Although Dr. Doan was dismissed from this case, the court makes factual findings regarding Dr. Doan's treatment of Ms. Hawkins because his treatment provides context for Dr. Jensen's treatment of Ms. Hawkins in November 2011.

[11] Percocet contains oxycodone.  *See* https://medlineplus.gov/druginfo/meds/a682132.html.

ORDER - 12

Doan noted that she drank "some alcohol (per her a small amount) prior to work" on October 22 and that she had become "habituated to taking a pain pill or drinking some alcohol during times of high stress." (*Id.*)  Ms. Hawkins requested an appointment with the VA Medical Center's Post-Traumatic Stress Disorder ("PTSD") clinic.  (*Id.*)

31.    Ms. Hawkins did not disclose any other psychotic episodes or psychiatric symptoms to Dr. Doan during her October 26, 2011 appointment.

32.    After reviewing Ms. Hawkins's records from Dr. Soeprono's October 22, 2011 psychiatry assessment, Dr. Doan determined that although Ms. Hawkins had previously experienced mental health episodes, she did not have a clear history of psychosis.  (6/9/25 Tr. at 169:2-21.)  He concluded that Ms. Hawkins's October 22 psychotic episode was substance-induced, likely resulting from an adverse interaction of oxycodone, alcohol, and clarithromycin.  (Def. Trial Ex. A-7 at 41-42; 6/9/25 Tr. at 165:11-18; *see also id.* at 168:18-169:1.)  Dr. Doan counseled Ms. Hawkins against using substances to treat her depression and anxiety.  (*Id.* at 42.)

33.    Given Ms. Hawkins's history of major depressive disorder and her reported stress and anxiety, Dr. Doan concluded that she should be placed on Sertraline.  (Def. Trial Ex. A-7 at 42; Admitted Facts ¶ 24; *see* 6/9/25 Tr. at 168:18-169:1.)  Dr. Doan also considered that Sertraline was safe for Ms. Hawkins to take while nursing her child.  (*See* 6/9/25 Tr. at 178:22-23-179:6.)[12]

---

[12] At trial, Ms. Hawkins's counsel asserted that Sertraline was improperly prescribed because, in her opinion, psychosis is a side effect of Sertraline.  (*See, e.g.*, 6/9/25 Tr. at 43:22-25.)  The court does not consider counsel's assertion in determining the Government's

ORDER - 13

34.     Dr. Doan instructed Ms. Hawkins to take 25 milligrams of Sertraline per day for one week, and then increase the dose to 50 milligrams per day. (Def. Trial Ex. A-7 at 42.)  Dr. Doan also referred Ms. Hawkins to the VA Medical Center's PTSD clinic. (*Id.*; *see id.* at 18 (Dr. Doan's PTSD consultation request).)  He also recommended that she follow up with her counselor, Ms. Swailes. (*See id.* at 42; Admitted Facts ¶ 25.)

35.     Dr. Takahashi concurred with Dr. Doan's assessment and treatment plan. (Admitted Facts ¶ 27; 6/11/25 Tr. at 376:2-19.)

36.     On November 12, 2011, Ms. Hawkins again tested positive for an H. Pylori infection. (Def. Trial Ex. A-7 at 40.)  Dr. Doan therefore prescribed Ms. Hawkins a ten-day course of the clarithromycin, amoxicillin, and pantoprazole triple therapy. (*Id.*)

**G.     Ms. Hawkins's November 16, 2011 Appointment with Dr. Doan**

37.     On November 16, 2011—three weeks after her October 26, 2011 appointment—Ms. Hawkins saw Dr. Doan at the VA Women's Clinic a second time. (*Id.* at 37-40.)  During this appointment, she reported symptoms related to her H. Pylori infection, as well as continued "depressed mood and labile emotions." (*Id.* at 37.)

38.     Dr. Doan counseled Ms. Hawkins that not enough time had passed since she started taking Sertraline on October 26, 2011, for that medication to start working. (*Id.*; *see* 6/9/25 Tr. at 189:4-10; *id.* at 187:1-7.)  He recommended Ms. Hawkins attend a follow-up appointment to potentially adjust her Sertraline dose in one to two months, or

---

liability.  Ms. Hawkins did not provide any expert testimony regarding the side effects of Sertraline, and her attorney's opinions regarding the side effects of Sertraline are not evidence.

sooner if needed. (Def. Trial Ex. A-7 at 38; Admitted Facts ¶ 32.)

39.     Ms. Hawkins did not follow up with Dr. Doan regarding her symptoms after November 16, 2011. (Def. Trial Ex. A-7 at 32-33 (call and appointment log).)

**H.     Ms. Hawkins's November 30, 2011 Appointment with Dr. Jensen**

40.     On November 30, 2011, Ms. Hawkins was evaluated by Dr. Jensen. (*Id.* at 35-37.)

41.     Before meeting with Ms. Hawkins, Dr. Jensen reviewed her October 22, 2011 ER records, her October 22, 2011 psychiatry assessment, and notes taken by a VA Medical Center social worker regarding her inpatient admission at Swedish Edmonds Hospital. (*Id.* at 49-50 (psychiatry assessment), 45 (social worker's note); *see* 6/10/25 Tr. at 267:19-23, 268:17-25, 308:24-309:14.) He also reviewed the records from Ms. Hawkins's appointments with Dr. Doan. (*See* 6/10/25 Tr. at 308:11-19.)

42.     Dr. Jensen observed that Dr. Doan's records stated that Ms. Hawkins's October 22 episode was "very far from her baseline" and that "nothing like th[at] ha[d] ever happened before[.]" (*See* 6/10/25 Tr. at 297:2-7; Def. Trial Ex. A-7 at 41.) He also observed that Ms. Hawkins was taking clarithromycin around the time of the October 22 episode. (Def. Trial Ex. A-7 at 36; 6/10/25 Tr. at 272:4-7.) Dr. Jensen noted that Ms. Hawkins reported drinking "a bit" and taking oxycodone at a party the night before her October 22 psychotic episode, and that she felt disoriented, sleepy, confused, and dream-like when she went to work on October 22, 2011. (Def. Trial Ex. A-7 at 35; *see* 6/10/25 Tr. at 272:4-7.)

43.     Dr. Jensen asked Ms. Hawkins about her psychiatric history. (*See* 6/9/25

ORDER - 15

Tr. at 137:19-21; *id.* at 54:3-5; Def. Trial Ex. A-7 at 35.)  Ms. Hawkins told Dr. Jensen that she remembered having reactions similar to the October 22 episode following periods of sleeplessness at ages 18 and 26, for which she was treated briefly with lithium and antidepressant medication.[13]  (Def. Trial Ex. A-7 at 35; *see also* 6/10/25 Tr. at 291:5-15.)  Based on Ms. Hawkins's description and medical records, Dr. Jensen understood that these prior incidents were not diagnosed as psychotic episodes, but rather were episodes of "confusion."  (*See id.* at 291:5-7, 309:18-23, 310:7-11.)

44.     Dr. Jensen testified that he asked Ms. Hawkins whether she experienced hallucinations, delusions, or paranoia, and she said that she did not.  (*Id.* at 318:15-19.)  Ms. Hawkins did not report any prior psychotic episodes or other psychotic symptoms to Dr. Jensen.  (*See id.* at 331:13-17; 6/9/25 Tr. at 137:19-21.)

45.     Ms. Hawkins and Dr. Jensen discussed her insomnia.  (6/10/25 Tr. at 310:16-25; Def. Trial Ex. A-7 at 35.)  Ms. Hawkins told Dr. Jensen she was feeling stressed, anxious, and depressed about the workplace harassment she experienced and her union action, and that she was up at night caring for her 18-month-old daughter.  (Def. Trial Ex. A-7 at 35; 6/10/25 Tr. at 311:6-12.)  Ms. Hawkins reported sleeping four hours per night.  (Def. Trial Ex. A-7 at 34.)  She also told Dr. Jensen she had stayed up late for several days prior to October 22 preparing for a hearing in her union action.  (*See id.* at 35.)  Dr. Jensen observed that, at the time of her October 2011 hospitalization, Ms. Hawkins reported sleeping six to eight hours per night.  (*See* 6/10/25 Tr. at 311:18-20;

---

[13] The court understands that these are the same episodes described in Dr. Soeprono's October 22, 2011 psychiatry assessment.  (Def. Trial Ex. A-7 at 50.)

ORDER - 16

Def. Trial Ex. A-7 at 50.)  He therefore concluded that her insomnia fluctuated.  (6/10/25 Tr. at 311:18-20.)

46.     In reviewing Ms. Hawkins's October 2011 hospitalization records, Dr. Jensen observed that Ms. Hawkins's symptoms deescalated "rapidly" after she received haloperidol and that she was not discharged from Swedish Edmonds Hospital with any medications.  (6/10/25 Tr. at 302:13-14; *see id.* at 307:9-15.)  Dr. Jensen testified that a psychiatric diagnosis like mania would not typically respond to a single dose of medication.  (*Id.* at 303:23-304:4.)  Dr. Jensen also noted that the results of Ms. Hawkins's medical examination and lab testing revealed no abnormalities, aside from a urine toxicology screening that was positive for oxycodone.  (*Id.* at 303:5-8.)

47.     Based on Ms. Hawkins's complaints of anxiety, depression, and insomnia, and her history of abuse, Dr. Jensen diagnosed Ms. Hawkins with PTSD.  (*Id.* at 292:21-293:3.)  PTSD typically includes episodes of confusion or dissociation under stress.  (*Id.* at 291:24-292:6, 320:7-17.)  Dr. Jensen also diagnosed Ms. Hawkins's October 22 episode as substance-induced delirium resulting from an adverse interaction between clarithromycin and oxycodone, in combination with her "tendency to dissociate under marked stress" and sleep deprivation.  (*See* Def. Trial Ex. A-7 at 35-36; 6/10/25 Tr. at 272:1-7, 298:13-16.)  Given Ms. Hawkins's description of her symptoms and her medical records, Dr. Jensen did not believe she suffered from chronic psychosis or had a primary psychotic disorder.  (6/10/25 Tr. at 270:5-7, 326:14-23.)

48.     Dr. Jensen planned to treat Ms. Hawkins's depression and anxiety, and expected that reducing those symptoms would in turn improve her insomnia.  (*See id*. at

ORDER - 17

313:4-8.)

49.     In planning Ms. Hawkins's course of treatment, Dr. Jensen considered that it was "best to minimize her medications as much as possible" because she was nursing and needed to be alert so she could care for her child. (*Id.* at 311:18-312:5.) Dr. Jensen concluded that Sertraline was an appropriate medication "[g]iven her degree of anxiety and depression," and that it was "the least harmful of the [antidepressants] for breast feeding, and [therefore] pose[d] little risk" to Ms. Hawkins's daughter. (Def. Trial Ex. A-7 at 36; *see* 6/10/25 Tr. at 311:22-312:3, 316:4-6.) He further concluded, however, that the 50 milligram dose she was taking was "too low." (Def. Trial Ex. A-7 at 36.) He increased the dosage to 100 milligrams per day. (*Id.*)

50.     A dose of 100 milligrams of Sertraline is within the range of an acceptable treatment dose. (*See* Def. Trial Ex. A-4 ("Vandenbelt Report") at 3; *see* 6/11/25 Tr. at 418:4-9 (Dr. Kovar's testimony); 6/10/25 Tr. at 210:14-16 (Dr. Dunner's testimony).) Typically, the top dosage for Sertraline is 200 milligrams. (*See* Vandenbelt Report at 3; 6/10/25 Tr. at 295:6-7 (Dr. Dunner's testimony).)

51.     Dr. Jensen did not prescribe any other medications to Ms. Hawkins on November 30, 2011. (*See* Def. Trial Ex. A-7 at 35-37.)

52.     Dr. Jensen recommended that Ms. Hawkins return to the clinic in four weeks for evaluation. (*Id.* at 36; *see* 6/10/25 Tr. at 295:19-23.) Dr. Jensen believed four weeks was an appropriate timeframe because, despite Ms. Hawkins's symptoms, she was caring for her daughter, had maintained a difficult job prior to her delirium, had a support system at home, and was seeing an outside therapist. (6/10/25 Tr. at 314:9-14, 22-25; *see*

318:20-319:7-25.)  Dr. Jensen recommended that Ms. Hawkins continue therapy with Ms. Swailes.  (Admitted Facts ¶ 37.)

53.  On December 7, 2011, Ms. Hawkins called the VA Women's Clinic requesting an appointment to address a skin rash.  (Def. Trial Ex. A-7 at 33.)  She also reported continued symptoms from H. Pylori.  (*Id.*)

54.  The VA Medical Center scheduled Ms. Hawkins for an appointment in the VA Women's Clinic for December 14, 2011.  (*Id.* at 16, 32.)  Ms. Hawkins, however, did not attend or reschedule her December 14, 2011 appointment.  (*Id.* at 32.)

55.  Between November 30, 2011 and December 15, 2011, Ms. Hawkins's insomnia worsened, but she did not report these symptoms to Dr. Jensen.  (6/9/25 Tr. at 55:19-56:6.)

56.  Between November 30, 2011 and December 15, 2011, Ms. Hawkins did not raise any mental health or sleep concerns with any medical provider at the VA Medical Center.  She also did not seek treatment with Ms. Swailes after her appointment with Dr. Jensen.  (*See* Admitted Facts ¶ 33.)

**I.    Ms. Hawkins's December 15, 2011 Psychotic Episode and the Aftermath**

57.  On December 15, 2011, Ms. Hawkins experienced a psychotic episode while watching a television show at her mother's house.  (6/9/25 Tr. at 62:1-63:21.)  During this episode, Ms. Hawkins stabbed her mother several times.  (*Id.* at 63:22-64:13.)

58.  Ms. Hawkins was charged with assault in the third degree in connection with her conduct during the October 22 episode.  (Admitted Facts ¶ 41.)  She was also charged with assault – domestic violence in the first and fourth degrees in connection

ORDER - 19

with her conduct during the December 15 episode.  (*Id.* ¶¶ 41-42.)

59.     Ms. Hawkins initially entered a plea of not guilty by reason of insanity.  (*Id.* ¶ 43.)

60.     The State amended Ms. Hawkins's felony charges to felony harassment – domestic violence and malicious mischief in the second degree.  (*Id.* ¶ 44.)

61.     Ms. Hawkins pleaded guilty to the amended felony charges and the misdemeanor assault charge, and was incarcerated for approximately one year.  (*Id.* ¶ 45; 6/9/25 Tr. at 64:19-25.)

62.     On May 1, 2012, the State of Washington initiated a Nursing Quality Assurance Commission Investigation charging Ms. Hawkins with unprofessional conduct in connection with the October 22 and December 15 episodes.  (Pl. Trial Ex. 11 at 2-3.)

63.     On January 23, 2013, the State of Washington and Ms. Hawkins entered into an agreed order suspending her nursing license for unprofessional conduct in violation of RCW 18.130.180(1) and (17),[14] and imposing limitations on her ability to petition for reinstatement.  (Admitted Facts ¶ 46.)

## II.     CONCLUSIONS OF LAW

1.     This is an action brought pursuant to the Federal Tort Claims Act ("FTCA") under 28 U.S.C. § 2675(a).  The court has jurisdiction over this matter under

---

[14] RCW 18.130.180(1) defines "unprofessional conduct" as the "commission of any act involving moral turpitude, dishonesty, or corruption relating to the practice of the person's profession" constitutes an act of unprofessional conduct.  RCW 18.130.180(17), in turn, provides that a "[c]onviction of any gross misdemeanor or felony relating to the practice of the person's profession" constitute unprofessional conduct.

28 U.S.C. § 1331 and § 1346(b).  Venue is proper in the Western District of Washington pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

2.      Under the FTCA, the Government is liable in the same manner and to the same extent as a private individual under like circumstances.  28 U.S.C. § 2674.

3.      Ms. Hawkins alleges that the Government is liable for Dr. Jensen's alleged medical malpractice (i.e., "professional negligence") in treating Ms. Hawkins.  (Hawkins FOFCOL ¶ 2.)

4.      Under the FTCA, the court applies the substantive law of the state where the allegedly negligent conduct occurred.  28 U.S.C. § 1346(b)(1).  Here, Washington law applies because Dr. Jensen's alleged medical malpractice took place in Washington.

5.      To prove a medical malpractice claim under Washington law, Ms. Hawkins must establish duty, breach, proximate cause, and injury.  *Mohr v. Grantham*, 262 P.3d 490, 493 (Wash. 2011) (citing RCW 7.70.040).

6.      Health care providers have a duty to "exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which [he or she] belongs, in the state of Washington, acting in the same or similar circumstances." *Pacheco v. United States*, 515 P.3d 510, 516 (Wash. 2022) (citing RCW 7.70.040(1)(a) (cleaned up)).

7.      To establish the "breach" element of her medical malpractice claim, Ms. Hawkins must prove that Dr. Jensen "failed to exercise that degree of care, skill, and learning expected of a reasonably prudent" psychiatrist acting in the same or similar

ORDER - 21

circumstances. *See Hill v. Sacred Heart Med. Ctr.*, 177 P.3d 1152, 1156-57 (Wash. Ct. App. 2008) (citing RCW 7.70.040(1), (2)). Ms. Hawkins must produce expert testimony to establish the standard of care. *Id.*

8. To prove proximate cause, Ms. Hawkins must demonstrate that Dr. Jensen's medical malpractice was both the legal cause and the "cause in fact" of her injury. *See Martini v. Post*, 313 P.3d 473, 479 (Wash. Ct. App. 2013). To prove cause in fact, she must show "that the harm suffered would not have occurred but for" Dr. Jensen's alleged medical malpractice. *Id.* "Medical expert testimony is generally required to prove causation." *Rounds v. Nellcor Puritan Bennett, Inc.*, 194 P.3d 274, 278 (Wash. Ct. App. 2008). Notably, the expert's testimony "must be sufficient to establish that the defendant's conduct 'probably' or 'more likely than not' caused the subsequent condition, rather than the accident or injury 'might have,' 'could have,' or 'possibly did' cause" the alleged injury. *See id.* at 278 (quoting *Merriman v. Toothaker*, 515 P.2d 509 (Wash. Ct. App. 1973)); *O'Donoghue v. Riggs*, 440 P.2d 823, 830 (Wash. 1968). In sum, the expert's testimony must be "based on a reasonable degree of medical certainty." *Rounds*, 194 P.3d at 278 (quoting *McLaughlin v. Cooke*, 774 P.2d 1171, 1175 (Wash. 1989)).

9. Below, the court examines the evidence and testimony submitted in support of Ms. Hawkins's medical malpractice claim.

**A.    Duty**

10. In the instant case, it is undisputed that Dr. Jensen had a duty to exercise the degree of care and skill expected of a reasonably prudent psychiatrist at the time he

ORDER - 22

treated Ms. Hawkins on November 30, 2011.  (*See* Hawkins FOFCOL ¶ 84; *see generally* Government FOFCOL); *see Omer v. Edgren*, 685 P.2d 635, 636 (Wash. Ct. App. 1984) (citation omitted).

**B.     Breach**

11.     Ms. Hawkins alleges that Dr. Jensen breached the standard of care of a psychiatrist by:  (1) failing to obtain Ms. Hawkins's complete psychiatric history; (2) failing to review available medical records regarding her psychiatric history; (3) failing to address her insomnia; (4) increasing her Sertraline dose "without adequately evaluating her risks for decompensation[;]" (5) failing to prescribe her sleep medication other than Sertraline; and (6) failing to monitor her more closely following the November 30, 2011 appointment.  (Hawkins FOFCOL ¶¶ 91, 96.)[15]  The court discusses these arguments in turn below.

12.     <u>Alleged Failure to Obtain Psychiatric History</u>:  Ms. Hawkins asserts that Dr. Jensen failed to obtain her complete psychiatric history.  (*Id.* ¶ 91.)  The court concludes, however, that Dr. Jensen did not breach the standard of care in obtaining Ms. Hawkins's psychiatric history.

    a.     Dr. Jensen testified that he asked Ms. Hawkins about her past mental health history and asked questions to rule out various diagnoses.  (6/10/25 Tr. at 307:21-308:1, 8-10.)  The court credits Dr. Jensen's testimony because Ms.

---

[15] Although Ms. Hawkins included the latter two in the "causation" section of her analysis (*see* Hawkins FOFCOL ¶ 96; *id.* ¶¶ 94-97), the court understands Ms. Hawkins to argue that Dr. Jensen breached the standard of care by failing to prescribe Ms. Hawkins different medication or to monitor her more closely.

ORDER - 23

Hawkins agreed that Dr. Jensen discussed her past medical history with her, although she could not remember what questions he asked her.  (6/9/25 Tr. at 137:19-21; *id.* at 52:9-13.)

b.      Dr. Vandenbelt testified that Dr. Jensen satisfied the standard of care in taking Ms. Hawkins's medical history.  (6/10/25 Tr. at 352:8-10; *id.* at 354:1-5, 11-13.)

c.      Dr. Dunner opined that Dr. Jensen did not take an adequate history of Ms. Hawkins's psychotic episodes.  (*Id.* at 233:9-11.)  On cross-examination, however, Dr. Dunner agreed that Dr. Jensen asked Ms. Hawkins about her prior psychiatric history but that he "d[idn't] know" whether Dr. Jensen got Ms. Hawkins's "full history."  (*Id.* at 249:9-18.)  Dr. Dunner believed Dr. Jensen noted only two of Ms. Hawkins's prior psychotic episodes when she, in his view, "had five or six" prior episodes.  (*Id.* at 249:17-22.)  As Ms. Hawkins's counsel conceded, however, Ms. Hawkins's purported pre-October 2011 psychotic episodes are not documented in any medical records that were available to Dr. Jensen.  And Dr. Dunner himself did not review any of Ms. Hawkins's records predating the October 2011 incident.  (*See* 6/9/25 Tr. at 243:14-24; Dunner Report at 1.)  Accordingly, the court concludes that Dr. Dunner's opinions regarding Ms. Hawkins's prior psychiatric history are speculative.

d.      Furthermore, Dr. Jensen noted two prior psychiatric events that Ms. Hawkins disclosed to him, neither of which she described as psychotic episodes. (Def. Trial Ex. A-7 at 35.)  Dr. Jensen's records are consistent with the psychiatric

ORDER - 24

history described in Ms. Hawkins's October 22, 2011 ER records.  (*Id.* at 51.)

13.    Dr. Dunner did not identify how Dr. Jensen's questioning of Ms. Hawkins's or his analysis of Ms. Hawkins's records breached the standard of care, nor did he offer any testimony regarding additional steps Dr. Jensen could have taken to, in Dr. Dunner's view, conform to the standard of care.

14.    Consequently, the court concludes that Ms. Hawkins failed to prove that Dr. Jensen breached the standard of care in obtaining Ms. Hawkins's medical history.

15.    Alleged Failure to Review Available Medical Records:  Ms. Hawkins asserts that Dr. Jensen failed to review available records "documenting her prior psychotic episodes."  (Hawkins FOFCOL ¶ 91.)  The court concludes that Dr. Jensen did not breach the standard of care in reviewing Ms. Hawkins's medical records.  Ms. Hawkins's psychotic episodes predating October 2011 were not documented in any records available to Dr. Jensen.[16]  Accordingly, he did not "fail to review" records related to Ms. Hawkins's pre-October 2011 psychiatric history.

16.    Dr. Jensen also did not fail to review records from Ms. Hawkins's October 22 episode and subsequent treatment.  Dr. Jensen testified that he reviewed records from Ms. Hawkins's October 22 emergency room treatment, including her psychiatric assessment on that date, and records from her appointments with Dr. Doan.  (6/10/25 Tr.

---

[16] Ms. Hawkins appears to argue that Dr. Jensen committed medical malpractice by failing to diagnose Ms. Hawkins's October 2011 psychotic episode as a recurrent psychotic episodes (*see* Hawkins FOFCOL ¶¶ 57-58, 65).  But misdiagnosis, if any, is not the basis for a medical malpractice action in the absence of a showing of a breach of the standard of care. *Reyes v. Yakima Health Dist.*, 419 P.3d 819, 824 (Wash. 2018).

ORDER - 25

at 267:19-23; *id.* at 308:24-309:14.)  He also reviewed the VA social worker's note summarizing her inpatient treatment at Swedish Edmonds Hospital.  (*Id.* at 319:23-322:11; *see* Def. Trial Ex. A-7 at 45.)

17.     Accordingly, the court concludes that Dr. Jensen did not breach the standard of care in reviewing Ms. Hawkins's medical records.

18.     <u>Alleged Failure to Address Insomnia:</u>  Ms. Hawkins argues that Dr. Jensen's treatment plan failed to address her "persistent insomnia."  (Hawkins FOFCOL ¶ 91.)  The court concludes that Dr. Jensen's treatment of Ms. Hawkins's insomnia did not breach the standard of care.

a.     Dr. Jensen considered Ms. Hawkins's insomnia when he developed his treatment plan.  (6/10/25 Tr. at 311:1-3.)  He observed that Ms. Hawkins's insomnia was "fluctuating" and appeared to be related to depression, anxiety, and stress associated with her union action and caring for her daughter.  (*See id.* at 311:6-19, 336:7-9.)  This testimony tracks Ms. Hawkins's medical records. Specifically, Ms. Hawkins reported to Dr. Soeprono that she was sleeping six to eight hours per night around the time of her October 2011 episode.  (Def. Trial Ex. A-7 at 50.)  At her appointment with Dr. Jensen, however, Ms. Hawkins reported that she was getting four hours of sleep per night (*id.* at 34), and was feeling stressed, anxious, and depressed after staying up for several days preparing for a hearing in her union action and caring for her daughter throughout the night (*id.* at 35).

b.     Dr. Jensen believed that Ms. Hawkins's insomnia was caused by her

ORDER - 26

depression and anxiety.  (*See* 6/10/25 Tr. at 313:4-8.)  Dr. Jensen testified that he continued Ms. Hawkins's Sertraline prescription to treat her depression and anxiety, which he expected would also improve her insomnia.  (*See id.*; *id.* at 315:10-12.)

c.      Dr. Vandenbelt testified that Dr. Jensen's treatment of Ms. Hawkins's insomnia symptoms with Sertraline satisfied the standard of care.  (*Id.* at 355:1-11.)  Dr. Kovar testified that Sertraline, "by virtue of [its] beneficial effect on mood, depression, and anxiety," can improve a patient's insomnia.  (*See* 6/11/25 Tr. at 412:9-12.)

d.      Although Dr. Dunner opined that Dr. Jensen failed to address Ms. Hawkins's insomnia (*see* 6/10/25 Tr. at 222:6-11), he also testified that insomnia is "a frequent symptom of depression" *(id.* at 215:4-5).  He did not opine that treating Ms. Hawkins's depression and anxiety could not improve her insomnia. (*See generally id.*)

19.      Accordingly, the court concludes that Dr. Jensen developed a plan to treat Ms. Hawkins's insomnia, and that his treatment did not breach the standard of care.

20.      Alleged Improper Sertraline Dosage:  Ms. Hawkins also contends that Dr. Jensen breached the standard of care by "[i]ncreasing her [S]ertraline dosage without adequately evaluating her risks for decompensation."  (Hawkins FOFCOL ¶ 91.)  Ms. Hawkins does not explain what she means by "decompensation."  (*See generally id.*)  Ms. Hawkins did not, however, offer any expert testimony that increasing her Sertraline dosage caused her December 15 psychotic episode.  To the contrary, Dr. Dunner testified

that Dr. Jensen's decision to increase the Sertraline dosage was "a step in the right direction[.]" (6/10/25 Tr. at 236:9-10.) Moreover, during closing argument, Ms. Hawkins's counsel stated that Dr. Jensen did not breach the standard of care by increasing her Sertraline dose. Therefore, the court concludes that Dr. Jensen did not breach the standard of care by increasing Ms. Hawkins's Sertraline dose.

21. Alleged Failure to Prescribe Sleep Medication Other Than Sertraline: Ms. Hawkins argues that Dr. Jensen should have prescribed her a medication other than Sertraline. (*See* Hawkins FOFCOL ¶ 96.) The court concludes that Dr. Jensen did not breach the standard of care by failing to prescribe a different medication.

a. Dr. Jensen testified that he continued Ms. Hawkins's Sertraline prescription because Sertraline is "one of the most effective" treatments for depression and anxiety, and because it was safe for Ms. Hawkins to take while she was nursing her daughter. (6/10/25 Tr. at 315:10-20, 316:4-6.) Dr. Jensen also considered that Ms. Hawkins was a single parent and a sedating medication could affect her alertness and ability to care for her daughter. (*Id.* at 311:18-312:5.)

b. Both Dr. Vandenbelt and Dr. Kovar opined that Dr. Jensen's decision to continue Ms. Hawkins's Sertraline was appropriate and within the standard of care. (*See* 6/10/25 Tr. at 354:14-19 (Dr. Vandenbelt's testimony); *see* 6/11/25 Tr. at 412:9-12; *see also* Def. Trial Ex. A-2 ("Kovar Report") at 3.)

c. Dr. Dunner did not opine that Dr. Jensen's decision to treat Ms. Hawkins with Sertraline breached the standard of care; rather, he testified that Dr. Jensen should have described an additional medication—nefazodone—to treat her

ORDER - 28

insomnia. (*See* 6/10/25 Tr. at 222:15-18, 238:20-25, 257:17-24; *see* Dunner Report at 6.) Dr. Jensen testified that he did not consider nefazodone for Ms. Hawkins because nefazodone was known to cause liver damage, causing the VA Medical Center pharmacy to caution providers not to prescribe it and to remove it from its formulary. (*See* 6/10/25 Tr. at 316:18-24.)

d.      Although Dr. Dunner opined that mirtazapine "might [have] be[en] useful[,]" he also said that mirtazapine is the "most sedating" medication available. (Dunner Report at 6; 6/10/25 Tr. at 257:19-20.) Dr. Jensen testified that he did not consider mirtazapine for Ms. Hawkins because it is "highly sedating" and could be transmitted to her daughter while nursing. (*Id.* at 317:1-4.)

e.      Dr. Jensen also observed that Ms. Hawkins reported self-medicating with alcohol or pain pills during times of stress. (*Id.* at 313:11-17; Def. Trial Ex. A-7 at 41.) Dr. Kovar testified that it "would have been distinctly inappropriate and against the standard of care to provide a benzodiazepine" to Ms. Hawkins after she reported self-medicating behavior. (6/11/25 at 414:14-19; *cf. id.* at 411:22-412:1.)

22.      Dr. Jensen did not breach the standard of care by failing to prescribe Ms. Hawkins risperidone—an antipsychotic medication. (*See* Hawkins FOFCOL ¶¶ 34, 36.) Dr. Jensen testified that Ms. Hawkins refused antipsychotic medication during her November 30, 2011 appointment, and Ms. Hawkins provided no evidence or testimony rebutting this statement. (*See* 6/10/25 Tr. at 328:31-329:1.) Ms. Hawkins also did not provide any expert testimony opining that risperidone would have been appropriate and safe for her to take while nursing and in light of her reported substance abuse.

ORDER - 29

23. The court concludes that Dr. Jensen did not breach the standard of care by failing to prescribe medications other than Sertraline.

24. <u>Alleged Failure to Provide Post-Appointment Monitoring</u>:  Ms. Hawkins argues that Dr. Jensen would have monitored Ms. Hawkins more closely had he "proper[ly]" reviewed her medical records.  (Hawkins FOFCOL ¶ 96.)  As stated, the court concludes that Dr. Jensen's review of Ms. Hawkins's medical records conformed to the standard of care.  The court also concludes that Dr. Jensen did not breach the standard of care by failing to monitor Ms. Hawkins more closely between November 30, 2011 and December 15, 2011.

25. Dr. Jensen testified that he recommended that Ms. Hawkins return for a follow-up appointment in four weeks because she was caring for her daughter, was generally functioning well, had a support system, and was seeing an outside therapist. (6/10/25 Tr. at 318:20-319:25.)  He further recommended that Ms. Hawkins continue to seek treatment with Ms. Swailes.  (Admitted Facts ¶ 37.)  But Ms. Hawkins neither followed up with Ms. Swailes nor contacted Dr. Jensen or any other provider at the VA Medical Center reporting sleep or mental health concerns between November 30, 2011 and December 15, 2011.  (6/9/25 Tr. at 61:1-10; *see* Def. Trial Ex. A-7 at 33.)

26. Consequently, the court concludes that Dr. Jensen did not breach the standard of care in his monitoring of Ms. Hawkins after the November 30, 2011 appointment.

27. In sum, the court concludes that Ms. Hawkins did not meet her burden to

ORDER - 30

prove that Dr. Jensen breached the standard of care of a psychiatrist.[17]

**C.      Causation**

28.      Ms. Hawkins asserts that each of Dr. Jensen's alleged breaches of the standard of care proximately caused her December 15 psychotic episode.  (Hawkins FOFCOL ¶¶ 94-97.)  Even if Dr. Jensen's treatment of Ms. Hawkins breached the standard of care of a psychiatrist, however, the court concludes that Ms. Hawkins failed to establish that Dr. Jensen's conduct proximately caused her December 15 psychotic episode.

a.      Dr. Kovar opined that Ms. Hawkins's December 15 episode was a "dysfunctional reaction to situational and emotional stress possibly exacerbated by transient lack of sleep, alcohol, and opioid misuse."  (Kovar Report at 3.)  He further testified that Dr. Jensen's conduct did not cause and could not have prevented Ms. Hawkins's December 15 episode.  (6/11/25 Tr. at 420:2-10; *see also* Kovar Report at 3.)

b.      Dr. Dunner did not offer opinions causally linking many of the above described alleged breaches to Ms. Hawkins's December 15 psychotic episode.  For example, he did not offer any opinion that Dr. Jensen's alleged failure to review Ms. Hawkins's records, his decision to increase her Sertraline dosage, or his

---

[17] The court does not address Ms. Hawkins's argument that Dr. Jensen "failed to obtain [Ms. Hawkins's] informed consent" regarding Sertraline.  (Hawkins FOFCOL ¶ 87.)  Informed consent and medical malpractice are distinct causes of actions in Washington, *Harbeson v. Parke-Davis,* 656 P.2d 483, 490-91 (Wash. 1983), and no informed consent claim was before the court at trial (*see* Pretrial Order (Dkt. # 126)).

ORDER - 31

decision to set her follow-up appointment for four weeks after November 30, 2011 caused her December 15 psychotic episode. (*See generally* Dunner Report; 6/10/25 Tr.) Rather, Dr. Dunner's causation opinions focused on Dr. Jensen's alleged failure to treat Ms. Hawkins's insomnia. (*See* Dunner Report at 6; *see also* 6/10/25 Tr. at 214:8-11, 215:4-9, 226:7-12, 227:1-3, 242:24-243:1.) Dr. Dunner testified that Dr. Jensen's failure to treat Ms. Hawkins's insomnia "may have contributed" to that episode. (6/10/25 Tr. at 227:1-3; *id.* at 242:24-243:1; Dunner Report at 6.) Dr. Dunner further testified that he was "not sure" whether Ms. Hawkins's insomnia "might have caused" or "possibly . . . trigger[ed]" the December 15 psychotic episode, or whether her insomnia was instead a "symptom" of the psychotic episodes. (6/10/25 Tr. at 215:4-9.) Dr. Dunner did not offer any testimony, however, that Dr. Jensen's alleged failure to treat Ms. Hawkins's insomnia more likely than not caused Ms. Hawkins's December 15 episode.

29.    The court concludes that Ms. Hawkins failed to meet her burden to prove that Dr. Jensen's conduct proximately caused her December 15 psychotic episode and alleged damages.

**D.    Damages**

30.    Ms. Hawkins asserts that she suffered damages as a result of Dr. Jensen's conduct, including criminal charges, loss of her nursing license, loss of employment, and emotional distress. (Hawkins FOFCOL ¶¶ 54, 97.)

31.    Because the court concludes that Ms. Hawkins failed to prove that Dr.

ORDER - 32

Jensen breached the standard of care or proximately caused her December 15 psychotic episode and resulting injuries, the court does not reach the issue of damages.

### III.   CONCLUSION

Based on the foregoing findings of fact and conclusions of law, the court DIRECTS the Clerk to enter judgment in favor of the Government.  The court DENIES the Government's Rule 50(b) motion for judgment as a matter of law (Dkt. # 149) as moot.

Dated this 25th day of August 2025.

JAMES L. ROBART
United States District Judge

ORDER - 33